0773-256 Montana Consumer Csl v. FERC This site has 20 minutes. Good morning. Good morning, Your Honor. Am I being heard okay? I'm getting an echo. If I can reserve 4 minutes for rebuttal. I'd like to thank the court. Could you get your name for the record, please? Robert Chablon. Thank you, sir. Thank you, Your Honor. I'd like to thank the court for expediting oral argument in this case. Needless to say, it's an important case to the Montana consumers as well as to the parties. The court asked for supplemental briefs on the impact of the Supreme Court's Morgan Stanley case on this case. All parties appear to agree that Morgan Stanley has no direct impact. But each of us, I will admit, give it a somewhat different spin. I would simply stress that to the extent that Morgan Stanley means that there will be less review of electric energy contracts once they're entered into, it makes it all the more important that decisions granting a seller market rate authority so that it can sell at any price are family-based. There are at least four reasons, Your Honor, why FERC's orders are reversible. And what I'll do is summarize them and then go on. First, FERC did not study the relevant market. Northwestern, Montana's largest and dominant electric utility, had to buy long-term firm power beginning in mid-2007 to sell residential consumers and small businesses. That is, the power that it purchased could not be interrupted. FERC granted PPL Montana market rate authority based upon studies of a different market and time period. It studied spot market sales for 2007. Second... 2004, right? I'm sorry? 2004, is that what they studied? I'm sorry, yes, they studied 2004 spot mortgage, Your Honor. Thank you. Second, FERC failed to consider the Montana Consumers Council's Attachment A analysis. This analysis showed that nearly all of the PPL, all of the power owned by others that PPL said could be imported into Montana to serve Montana markets, was either committed or contracted to serve others, or was non-deliverable. Third, in studying whether PPLM had market power, in conducting its test, FERC allowed PPL to deduct from its generation supply generation that was necessary to serve the Northwestern replacement contract. Thus, FERC did not study in its analysis the power supply that would serve the contract which we submit had to ultimately be just and reasonable. Just a minute. So you're setting that out as a separate problem from the first problem? Yes. One is a history problem, or a history of spot market problem. And you're essentially saying, but even if that's okay, they should have made an exception for this.  If they had studied the forward market, or if they had studied the 2007 market, then they would have deducted, then they would not have allowed PPLM to deduct that generation. I understand that. But are you suggesting that even if they ordinarily, and for the most part, did do that, they still should have handled this differently? I'm trying to find out whether there's two issues or one issue here. I think there are two issues. One is the spot market sale issue. In any event, what FERC does to assess whether a company has market power is it studies sample days and how much supply can be delivered to serve the market on those sample days. If a company like Northwestern, if a utility, is going to contract for a long-term firm market, a test of spot markets doesn't tell you what you can contract for. That's problem one. Problem two, in doing the tests, it allowed PPL to deduct 781 megawatts of power under contracts that were expiring. So those are two problems. Do you know whether in other contexts, in trying to figure out what the relevant market is for market power, I actually have two questions. But ordinarily, if you were trying to do it for a monopolization study, for a trust case, or for some other purpose, trying to figure out market power, would you back out, in general, would you back out long-term contracts? And in particular, would you back out one in this context? Is there any analogy that's useful here? Yes, Your Honor. They use the same kind of delivered price test analysis in merger cases. Only in merger cases, FERC says in its brief that they don't allow the deduction because it's forward-looking. And my challenging question would be, is if you have to be forward-looking in a merger case, because it's not so easy to change the merger case, why don't you have to be forward-looking in a market power case where you're going to lock in, especially with Snohomish, where you're going to lock in contracts or may for years? I do it differently in the merger case, Your Honor, than they do in these cases. In the merger cases, you would not be allowed to deduct the 781 megawatts. Isn't one of the differences, and maybe FERC will respond as well, is there is a difference in the merger context because you're changing the market, in effect, and you're changing the market power in the forward-looking, if you're the FTC or DOJ looking at a downstream merger case. Whereas here, if you're trying to get this point in time, whether there's market power now, that is a significant difference. The question then, it seems to me, is in taking a picture of today's market power to make a determination, what role do long-term contracts play? I understand, if I understand your argument, you say, well, if you don't factor them in, you don't have a picture of today's market. Is that your point? No, it goes beyond that. There is the difference you state. Your statement is making a correct difference. It's usually a good idea to tell judges that their statements are correct. It might be a question of antitrust law rather than my stating the principle. I think there are similar factors here. The goal of these market power studies is not to abstractly find whether PPL has market power or it doesn't have market power. The goal is to determine whether PPL should be able to enter into wholesale power contracts at market, that is, at whatever price it can negotiate. These contracts will be entered into for the future. Right, but when you say that's the goal... That's the purpose. That's the purpose, that's the end game, but the FERC has a whole construct in how it figures out whether there's market power, because if there is, then you don't get to do the end game, you have to do it the traditional way. It seems like, in a way, we're mixing and matching the remedy with the determination in some way. Your question goes, I think, to the core of this case. FERC has its way of doing market power analyses. The market power analyses that it does uses a past time period and spot markets. The market power analyses are to determine whether in the future companies' sales will be considered just and reasonable or closer than that. Passing the market power test is a prerequisite for selling at non-regulated rates. If you don't pass the test or don't get market rate authority, you cannot sell at non-regulated rates. I am simply saying that in this case, as applied to the very, very small and isolated Montana market, it was, if you will, arbitrary and capricious in APA terminology. For FERC to consider whether PPLM had market power, which would allow it, if it did not, would allow it to make future sales without considering the conditions at the time period the sales would be made. I just want to make sure, you've now focused on something kind of narrower, and that, of course, is the isolated Montana market, which we know is different than the California energy market. But would you just tell me what your view is in making this determination using these various factors of the DPT? Are you saying that FERC went outside the isolated Montana market, or they didn't analyze it correctly? Well, both. First, I'm saying they didn't analyze it correctly because the test they applied, as they applied them, could not possibly measure whether PPLM would have market power. For example, in entering into the contract with Northwestern, because that contract was for a long-term, firm power supply, which Northwestern had to have, and the test didn't measure that. What about the fact that they actually had two measures? They had that measure, and then they had what they called the economic capacity measure, that, as I understood, did include all capacity and didn't back out anything. Apparently, when they did this DPT test, they considered both of those measures with regard to market share, and I gather just kind of eyeballed the two of them together is what I understand happened. Well, it's very clear, Your Honor, that if they didn't back out the 781 megawatts, for example, they failed both tests. But FERC said not. FERC specifically said not. Well, first of all, obviously, it matters what the denominator is, and that's another question I have. What is the denominator in these cases? What's the market that you're comparing it to? But I gather that when you do the economic capacity measure, you have a different denominator as well as a different numerator, and the numbers look different but not that different. Is that not right? Well, in the economic capacity test, you simply take the total capacity. The reality is the problem I'm causing simply because these tests are complicated. Let me try and cut through it this way. I submit, and we put some numbers in our reply brief to try and bring it back to reality, and I refer you to Dr. Wilson's exhibit affidavit number four. Exhibit number four. But most of the capacity in Montana is the coal strip plant. PPL's share is sold in Montana. The rest of it, apart from a small amount owned by Northwestern, and it agreed to sell itself the excess, is contracted to Oregon and Washington state utilities. Apart from that, there's Judith Gap wind capacity, which is about 150 megawatts, some firming, and a very little QF capacity, and hardly anything else in Montana. If you run the tests, Montana will have market power, but. The next question is, and I apologize if I'm giving a complicated answer, how much power can be imported? So this goes to my denominator question, as I understand it. In both the tests, both the economic capacity test and the economic availability or available power test, is the denominator, meaning what market are we comparing it to, is it what's generated in Montana, or is it what's available for use in Montana, or what is it? There are two tests. There's a market share test, and there's a so-called pivotal supplier test. In both of those tests, you can include in a certain amount of non-Montana capacity. And I'm going to make an intercept here, but they almost have to, to be clear. In point, and our bottom line is, if you look at the tests, it is very clear that PPLM depressed the amount of its own capacity, for example, by not counting the 781. I asked you a question, I say, I'm sorry, I asked you my question. As I understand it, in doing the other tests, the economic capacity test, that wasn't backed down. Am I right about that? That power was counted. Give me a second to think. I think that's correct. All right, so that's what I'm asking you. I think that's correct. Why is all the focus in this case on the standard in which, the problematical standard, where the contract and other long-term contracts were backed down, rather than on the alternative standard, which was calculated, and as I understand it, was used? That's what I want to know. What I'm telling you is that if FERC had, that FERC fails both tests, and it's mathematically demonstrable, and it's clear it would fail both tests, because if you don't deduct the 781 from the capacity test, that PPLM will be dominant, except, FERC made, first of all, FERC primarily looked at the available economic study, they just do, but second, apart from, they say it's a judgment, and they say they look at everything, but second, when you look at others' capacity, FERC did two things which I think infected all of its tests. Since you're comparing PPLM's capacity with others' capacity, it treated others as having capacity which was committed for sale to Oregon and Washington State utilities, point one. Point two, it counted as transmission availability approximately a thousand more megawatts, which is a lot for Montana, than a utility outside of Montana could contract for on a long-term, firm basis. This is because they use the spot markets, the short-term sample days, but a utility outside of Montana cannot buy transmission for three, four years into the future. That is not available on the transmission provider's oasis, simply can't buy it. And that was the second error. The third is, we did a study, this is our... Can I go back to that error, which is sort of an apples and oranges problem of the spot market versus reality market? Yes. Okay. And so you're saying, when you say that they cannot buy utilities outside Montana, can't purchase this transmission power, is that because of a regulatory restriction? They have something called the, let me make it very simple, there are rules under which people can contract for transmission. They can't contract for transmission that can't be transmitted. The utilities who own transmission have to post on what is called an oasis, available transmission. The reason for studies, or PPL studies, showed more transmission than an outsider could contract for, was because they weren't considering the future long-term power. But I'm saying what FERC did is irrational, because they weren't measuring the power an outside competitor could use. And my third point, I see my lights on, but my third point as to why they were absolutely wrong, is we put in a study, the attachment A analysis, studying each of PPLM's claimed power sources. In its initial order, FERC didn't study them, didn't mention them. We complained about this and attached the study to our rehearing order. In its rehearing order, they said, yes, we did consider it. But they discussed a completely different exhibit. And there is nowhere in FERC's orders that you can say, no, NCC, we are wrong. If you're right about that, what is the remedy? Do we send it back to them, go back and look at attachment A, and start again? I would suggest a, can I just finish my past sentence and then answer your question? My past sentence, they don't mention, and I think it's significant in their orders, how you can get power from Arizona, which is used to serve California markets, or British Columbia. How you can get that specific power to serve Northwestern. I think the remedy... And that's set forth in attachment A, which they didn't... Yes. Okay, so if they didn't look at attachment A, what would you have us do about that? What I would have you do, it pains me, but what I would have you do is remand it. If you agree with the points, or some of them that we've made, then FERC has to reconsider the grant of market authority to PPLM. Now, I do say that if that market power authority falls, the PPL Montana Northwestern contract falls. In other words, FERC first on remand has to find that PPLM isn't entitled to market power, because they corrected its orders. But ultimately, an issue is whether the Montana consumers will pay at rates the sky's the limit, or whether they'll pay cost-based rates, or inappropriate rates. We have gone over the time, but let me just see if Judge McEwen or Judge Berzon have any additional questions. Well, you had given us three major issues, and I stopped you before you got to the fourth. I just want to know what the fourth one was. The fourth was transmission. The fact that they treated in their studies more transmission than somebody who wanted to contract for transmission to serve Northwestern could actually buy on a long-term basis, and the key is on a long-term basis. In other words, day by day. Thank you. Thank you very much, Your Honor. Thank you. Good morning. I'm Carol Banta for the commission. With me at council table are John Longstreth and Don Kaplan, representing intervener PPL parties. I would like to reserve five minutes of my time for Mr. Longstreth to present their argument, if possible. I'd like to begin with the last point. There is a lot to cover, and I do hope to cover all of it. On the last point about attachment A, the commission did, in fact, consider not just the fourth Wilson affidavit, but the attachment A that was submitted in February 2006. I believe the citations are the rates order around paragraphs 53 and forward from there, and paragraph 37 in the rehearing order. The arguments about the Arizona plants and these other plants from outside the area were also made by Northwestern, and the commission did answer that, did look at that. Northwestern's analysis showed that even if you backed out those plants, the effect on the market power analysis was very small. Is there some confusion over which attachment A they looked at? There was, but the commission looked at both. There is some confusion in that both, as I understand it, the first one, which I think is the fourth Wilson affidavit, and the one submitted in February 2006 were called attachment A and made very similar arguments, but the commission... One was about transmission, and the other one was about generation. I think there was a lot of overlap, and Northwestern made the same arguments. So paragraph 37 of the rehearing order... If I'm remembering that correctly, and it refers... It's the same attachment A where they submitted this analysis? It's the one they were arguing on rehearing had been neglected. If you look at footnote 40, it says filed under seal February 26, 2006. Their brief refers to it as February 24th. I think that's just a filing versus docketing difference, something like that. But if you look specifically... And that refers in paragraph 37, if you look at... If I'm thinking of the right thing. If you look at the footnotes, that tracks you back to the original order, paragraph 53, 54, 55. They're talking about a facility in Canada, the Gila one in Arizona. But also in the petitioner's brief, I believe, when it argues about those particular facilities, it says they have, in fact, sold in the short-term markets in Montana. So this goes back to the short-term versus long-term. Petitioners are arguing that those plans would not be available to serve Northwestern on a long-term basis. But as to whether they were appropriately considered in the economic capacity and available economic capacity for the purpose of the DPT test, they did sell short-term in the Montana markets. But why wouldn't it be relevant to know whether they were available in the long-term? And particularly, isn't there a kind of lack of symmetry, unless I'm misunderstanding the standard, which is possible, between saying that with regard to the available economic capacity that you back out long-term contracts on... I keep thinking of the numerator and denominator because it's helpful to me, but on the numerator. But apparently not on the denominator, i.e. not in determining what the breadth of the market is. Is that right or wrong? I don't think that's right, because if you're looking at the short-term markets, and we will absolutely get to the short-term versus long-term issue, but if you're looking at what capacity is available in this market, even though those outside plants may have their own long-term commitments, they are making sales into this market. How do you figure out? The part that I don't really understand is you have to compare A to B, i.e. how much megawattage PPL has and how much megawattage there is in the relevant market altogether. So how do you do B? What are you adding into B? I gather the argument is they say the problem is you're adding in capacity that's really not available because it's committed long-term. Except that some of it may be committed long-term, but it is being sold in short-term markets at times. That's my understanding. I mean, there's a lot of data that goes into this, and this was based on data from 2004. In fact, the Commission also... Are you saying that it may be committed here in a long-term contract, but the holder of the long-term contract have the ability to sell in a short-term market, in a spot market? That's my understanding. I think that they have made power sales from their plants. And in fact, the Commission cited... But how much? That's what I'm not understanding. The spot market is, as I understand it, you're looking at certain days. But in order to know... So you're then looking at the market for each day? Is that what this percentage is of? Yes. So each day, you're adding up how much total is sold, and how much of that is PPL? I'm getting a little over my head at that point, but I think so, because it does test the 10 different load conditions. So you've got the super peak, peak and off peak for winter, summer, and the shoulder season, and then the additional super peak in the summer. So if that were true, I guess that the long-term contracts would essentially be backed out of the denominator as well, because nobody's selling them on that day, or what? You might not know, because it might be power from a long-term contract that's in a spot market, is that... It might be. I think that that's probably the case. And also keeping in mind with the outside generators that are importing into this market, they are all reduced by the simultaneous import limits, the simultaneous import transmission limits. What does that mean? The way the study is done, you look at the economic capacity and the available capacity, but when you're looking at power that has to be imported into the control area, that has to be reduced by the study of simultaneous import limits. The petitioners disagree with the Commission's approach  but it is a modeling analysis that the Commission has carefully looked at and determined how it should be done. And it is a model. And it gets more complicated from there, I'm afraid. But you do take this whole pool of whatever number of megawatts you're counting from the outside generators, but then it does get reduced, it's sort of capped at what the simultaneous import transmission limits are. My understanding is that there's now been a regulation that sort of supersedes the particular analysis in this case to some degree, and that there's a lawsuit pending about that here at this point. Many. The Commission is particularly concerned that, to the extent we get into some of the policy decision-making that the Commission has been doing, has a formal rulemaking with dozens, I don't even know how many parties that have been involved, including petitioners here, that is pending in, I believe, seven different petitions, which now will all be in front of this Court. Four of them are currently in front of the Court being held in abeyance, or stayed, I forget exactly. The other three from the D.C. Circuit, that Court granted our motion to transfer as an administrative matter, as a ministerial matter, on Friday. There's still an ongoing proceeding where the Commission is considering... Do you move to transfer those where? To this Court. Ministerially... I thought I already had 190. It's actually his fault, because he filed the first petition for review. The Montana Consumer Council filed the first petition for review. So just as a ministerial matter under 28 U.S.C. 2112, we asked the D.C. Circuit to at least get it all in front of one Court. And does the record in that case... I mean, for example, one of the things I'm having a hard time with, and would really like some explanation about, is what is the validity of this spot market to long-term market assumption, or presumption. And in this record, we really don't have that. It is discussed, but certainly not in the same kind of detail. And the Commission didn't come up with this assumption out of thin air. I think it first articulated it in an order in 1994. We cite it in our brief, the Kansas City Power and Light, and has relied on it many times since, and has re-examined it again in the Order 697. I guess these are the questions I would raise, and I would hope would be addressed somewhere, but they're not addressed in this record. It would seem that some of what is sold aside from barriers of entry is just not going to be available. Wind power, I gather, is not available for long-term contracts. Actually, I believe that Northwestern entered into a contract with the Judith Gap wind power facility long-term. So that's not quite... But more than that, certain companies are selling surplus, but they wouldn't be available for long-term contracts. Well, the way the Commission has long looked at this, in 1994 it said that based on economic theory as well as the Commission's own experience, market power, if it exists, is most likely to be exercised and detected in the short-term market because, in Kansas City Power and Light, the Commission said, as a matter of economic theory, it is very difficult to maintain market power over the long run, absent barriers to entry, and I will get to that, that barriers to entry are critical to sustaining long-term market power. I guess there's one question that they raise that you can answer. Is it really in a way that Montana operates as an isolated market, although obviously it has interconnections and we recommend that, but it's really maybe a unique kind of market, and can you tell us whether the amount of long-term contracts here in relation to the amount of power is unusual compared to other markets? I don't know the answer to that. I do know that there's a lot of generation in Montana exports, more, there's a lot of generation in Montana that gets exported to other markets. As far as Montana being somehow unique, and I don't want to get away from this issue, but I know time is running short, that the commission uses as a starting step, and it's not the end game, I do also want to address that, the DPT test, the Delivered Price Test Analysis, was not developed to use in large spot markets in the California markets. It was developed, well, it's adapted from what DOJ and the Federal Trade Commission have been using since the early 80s, and it was adapted in 1996 and you look for market power by looking at the short-term markets because the commission in its experience, as well as its economic theory and analysis, that market power is easier to exercise in the short-term, and if it exists, it's going to be detectable in the short-term market, and it can't be sustained long-term. Yes, there are two sets of problems. One is the barriers to entry. Now, as I understand it, there that PPL had not created in barriers to entry. Right. But that's not all of it, right? I mean, there could be barriers to entry that PPL wasn't creating, and you never really went back to that. Actually, the commission did look at, in the orders under review here, any evidence in the record of barriers to entry and found that there just isn't any, and in fact looked, and this is coming back to the point I was making, in the analysis looking at the short-term market, the commission said in the screen failure order, the September 1st order, as well as these orders, we'll look at additional evidence, bring it in, and Northwestern did, and then PPL did as well, about the request for proposals that Northwestern had done that confirmed that there actually were entities. There were multiple bidders. Many bidders, yes. Some maybe disqualified for various reasons. That request for a proposal, and that there is new generation coming in, and I believe there are other examples of that, and that actually leads to another point about using the historical data. The commission, of course, didn't make all assumptions in favor of PPL. The commission rejected PPL's study of 2006 for the same reason that it rejected the petitioners already know about. So to isolate the question of what I'm calling the backing out of the long-term contracts, I mean, to some degree, that's an artifact of the historical approach. But insofar as you can isolate it from the historical approach, I mean, when you're briefed, you can't just keep coming back to treating it as the historical approach. Well, you can't isolate it from the historical approach, because if you account for what's going to happen a few years hence with regard to the applicants' capacity, you have to make the same judgments with regard to... or you can look at it as an exception to the rule for not considering long-term contracts. Now, you can look at it as of 2004 and say, but we are going to consider this set of... make a wattage that is committed in a long-term contract, because we know that that's going to be... that's really the main issue, is that set of wattage. It does... So it doesn't have to be tied into the historical model. Well, but it does distort what you're looking for when you do a delivered price test. I mean, it changes your numerators and denominators in that sense. And it also accounts for... It changes both. It accounts for one known and measurable in the future, but none of the others. I'm trying to suggest that we don't have to look at it as known and measurable in the future. We can just look at it in terms of what are we going to consider in the available economic test now. Are we going to consider this set of power or not? See, I'm not an economist or an antitrust analyst, but it does seem that it would distort your ability to look at what's going on in the short-term markets. But I don't want to suggest that the Commission is blind to that and in this case considered all the evidence before it looked at... Let me ask it a different way. I guess one concern might be that in a way you could game the system so we know what the DPT covers and if it excludes long-term contracts and then we know as time comes on when you're going to make a determination on how the rates would be calculated, could you find yourself in a situation with people gaming the market in effect where I guess I'll say the long-term contracts continue to kind of go undercover and they never get factored in? No. Well, for one thing, contracts are reported to the Commission. I understand that they're reported to the public. I don't mean that they're under the radar, but they're under the calculational radar. I think that absolutely goes back to the man-intervenors. Yeah, they came in and said, look, this is never going to be considered if you don't consider it now. It was considered in a sense, but just to answer Judge McEwen's question, if you're gaming the system, surely that would be – the Commission would want to see evidence if there was something... We have this situation in which – maybe this is going to be – they're going to mirror each other, but there is this huge chunk of energy in the long-term market that you're never going to consider anywhere. And if you're going to try to figure out how much market power does this company have in the long-term markets, you're never considering a huge chunk of – ever – a huge chunk of the energy, which is presumably asserting some sort of leverage on its ability to sell power to Canada at a price that maybe doesn't reflect the short-term market because there's so much of it. I think I'd make three points to that. First, the Commission considered alternative numbers, which Northwestern had done. It used Northwestern's numbers because it complied with the Commission's simultaneous import limit study, whereas Montana said not, and said that even when you include the various capacity that we're talking about here... Well, first of all, I don't think it considered all of it. It considered some of it as I understand it, but not all of it. I think it considered the 450, but not the rest of the long-term. That's what I understood. I'm not sure I understand it the same way, but it did look and see, yes, the market shares go up a little instead of 25 percent. The top one is 33 percent, although the Commission notes that's off-peak. That causes a little less concern than at peak. It looked at all that, but then it also looked at the additional evidence. It looked at the request for proposals and the long-term bids, people willing to come into this market to sell long-term and to compete for that business with Northwestern. That was additional evidence that's outside the DPT analysis. As I said, it doesn't begin and end with the DPT analysis. And in the re-hearing order of the Commission, also, although all parties agree that the contract is not at issue in this case, and it could be subject to a 206 complaint as part of the Commission's ongoing monitoring... I want to ask you about that too, but go ahead. Sure. Paragraph 3, I believe it is, of the re-hearing order said we've looked at what happened to the rates under this contract and they aren't out of line with what the market is doing, where market prices are. So it eyeballed the rates under that contract and that's in addition to the DPT analysis. So the Commission doesn't ignore the fact that there's the 450 megawatt contract out there that came up for renewal. Can you explain to me how the ongoing review process figures into this? Sure. And this is really, it's actually important because I know this Court has quite a bit of experience with the California energy crisis and the problems that came out of that. And all of this and what's going on in the formal rulemaking as well as the screenings orders is all part of the Commission's ongoing effort to put more teeth in the process. It overhauled, you know, before the California energy crisis it was a case-by-case determination of market-based rates. After the California energy crisis the Commission started looking at first the initial review and the tri-annual reviews. How do we make that more rigorous? How do we make it consistent and predictable and data that's accessible to everyone and really make it a rigorous analysis that some entities have failed? And the screenings orders came out of that as an interim measure and the Commission said we're also instituting a formal rulemaking. So all of this  kind of parallel to this case but that's the context. All of this is post-California energy crisis. The Commission putting more teeth not only, of course, in the market-based rate review and the tri-annual reviews but then also the electronic quarterly reports the requirement of that entities losing their market-based rate authority for failure to comply with that. Are these subsequent reviews conducted the same way that the present review is? Yes, well this isn't an initial review. This is a subsequent. It's under a newer test but this was a renewal of market-based rate authority and section 697 set out a new schedule to have entire regions of the country do their simultaneously so everyone can be using the same data, the same market data and really have some consistency between cases and that will be 2010. My related question is you several times suggested there would be ways to review these contracts and or the market-based rate authority in the interim before the next scheduled review and I'm not sure any of those are realistic. At one point you say well every time there's a new 100 megawatts you have to report it and that can trigger something but this would this long-term contract would never be that because it's not additional megawatts it's the same megawatts. If it doesn't expire, if it's renewed but the contract is reported and again these positions never have a lot of complaints. What do you do about that? After Morgan Stanley and I think this is a question that's actually come up in the Morgan Stanley related case is anybody going to be able to challenge under 206? Would Montana be able to challenge substantively under 206 or are they only going to be able to challenge under Mobile Sierra standard? Well my understanding is Mobile Sierra is an application of 206 but I would be getting ahead of myself if I spoke for the commission. The commission hasn't dealt with those cases on remand. But you can bring it to a 206 complaint. I think the question there is what standard applies and I would be getting way ahead of the agency. So all you're saying is they could challenge it. You're not saying they could challenge it on a cost rate basis but they may be able to challenge it on a Mobile Sierra basis or they may be able to challenge it on a market rate issue? I don't know. Well if they thought the rates were unjust and unreasonable they could bring a 206 complaint. Then they would bring a 206 complaint correct? Right which they have not done. Again I emphasize and by the time we get to the supplemental briefing in this case everyone agrees that that contract was not before the commission on a 206 complaint here although as I said the commission wasn't blind to it and I would like to hear from PPL as well. Thank you. Okay thank you. Five minutes for Mr. Longstreth. Thank you your Honor. I'm John Longstreth from the firm of P&L Gates and we represent the PPL respondent intervenors in support of FERC. First of all just to make an overarching point here. I do understand that the PPL is a complicated factual matter and I think even the petitioner's counsel stated that and I think this is why there shouldn't be really anything unusual about this case. FERC deals with these kinds of factual determinations all the time and this court held just as recently as about 10 days ago in the Snoqualmie case. This court will defer when the agency actions quote, involving primarily issues of fact and where analysis of the relevant documents requires a high level of technical expertise. Is that a fact question or a question of law? I think it's a question of FERC having established a standard. You could call it a policy or a standard but based on its own experience with the markets. At the time of the Kansas City case when they first adopted this view that if they found no market power in the short term markets because of entry you would not have market power in the long term markets they said that was based on their experience up to that time, 1994, that they would not  power in the short term markets. It's also based on FERC's expertise as the expert agency. That's right in the Kansas City case that's discussed in our brief. I think that's the first thing to think about. This was a classic battle of the expert situation where they had their expert testimony, PPL put in its expert testimony, the commission weighed both of those and determined that PPL's was more believable. I can point out, I'm sorry. We still have to review something. So, and therefore we have to at least make some effort to understand it. One of the things I'd like to understand is why the, the, there seem to be these two different measures that go into the DPT of market power. One is, or contributes to the market power determination. One is this available capacity, the other one is the economic capacity. And for all the reasons we've discussed, the first one seems to have some problems in this instance. And because there's this huge chunk of power that's really not being considered and will never be considered. So my question is, why, would it make a difference if it was the other measure that was used, the economic capacity measure? And why didn't, we don't really have an explanation of how much the agency relied on one rather than the other and how much difference it would have made and so on. So is this something that we should ask the agency to explain to us and under remit? Well, the agency actually looked at both of them and found that PPL met both the test under both the economic capacity and the available economic capacity. And I think your question, Judge Burson, earlier about the denominator, if you look at supplemental record 179, that's where our experts sat out his analysis and included both economic capacity and available economic capacity. And the denominator is higher in the available economic capacity because that doesn't back out the committed. And another thing I'd like to point out, the petitioners mentioned that in their reply brief they did a calculation that showed that this made a difference. Their calculation actually had exactly that numerator denominator problem. What they did was... I think you're right. Yeah, they did. In other words, they added back in the backed out long-term contracts, added in the PPL denominator, but not the numerator. And if you actually do it right, you find we're down to the 36 percent range, I think, under their calculation. But that's actually higher than what FERC used. And that's what the explanation... Well, FERC said essentially if you take into account that change, backing out those contracts, the highest was 33 percent, which they felt still in light of all of the other things, including the fact that the Northwestern... I mean, the one thing that's unusual about this Northwestern market is it produces twice as much energy as it sells. It's pretty hard to exercise, and as it uses, so it exports about half of it. It's pretty hard to exercise market power, just as an antitrust matter when you've got that much... But isn't there some tension, or is there? And this is the question we were talking about before and no one seems to know exactly how it's done. And if you're putting... If you're backing the long-term contracts out of the numerator, but you're not backing them out of the denominator, essentially... I mean, that's the complaint, as I understand it. No, that's not what we did. That's why I pointed you to... That's not what FERC did, and that's why I pointed you to S-179. Basically, when we back them out of the numerator, we back them out of the denominator, and when we didn't back them out of the numerator, we didn't back them out of the denominator. So the attachment A fight about your including capacity that's actually committed elsewhere is not something that FERC Council expressed very accurately. The attachment A... There were, in fact, two attachment As, and there was one that they put in first, and then there was one that they put in second. I'm talking about the one that directly addresses the capacity question and not the transmission question. Well, both of them address the capacity question, and if you look at... I think it's... I wrote down the exhibit of record here for the first attachment A, 320-327. They've got seven or eight pages in their first attachment A about generation capacity. So they really deal with that in both. It's not the question where they dealt with completely different subject matter material in the second attachment A as the first attachment A. As a matter of fact, the second attachment... All right, but my understanding of their basic complaint with regards to generation capacity and not transmission capacity is that generation capacity is being used as if or is available in the market, but it's really committed. That's what they're saying. And you're saying that's not so? I think that is correct. And one of the points... What's correct? I'm sorry? What's correct? That it's not true? Yes, it's not true. A lot of the generation capacity they pulled out of the market should have been in the market, but then also, as Northwestern's analysis showed, even if you count in the... For example, Pacific Corp, there's 86, and this is mentioned in one of... This was mentioned in FERC's order. But at rehearing order paragraph 46, there were 86 megawatts for Pacific Corp. They claim that should have been backed out because Pacific Corp was using it for its own load, but we went and looked at Pacific Corp's own MBR analysis, and they put that in the Northwestern area. So they were just wrong about that. They were also wrong when they said that we had a 90 megawatt transmission capacity that we didn't count. In fact, we did count. There are a lot of factual errors in that. You got one point looking at an economic analysis in terms of your, in effect, overcapacity in terms of having, I guess, an export excess. Right. Is that factored in by the FERC  somewhere, or acknowledged? It's acknowledged in the September 1 order that there's a, I think, paragraph 46. It's not acknowledged in the September 1. I'm not sure exactly where it is, but it's in paragraph 39 of the September 1 order where they point out that there are 2,200 megawatts of exports in the market. But I think the key for transmission capacity, and this is to get to a point that we didn't make, is first of all, the RFP results where everybody bid into those markets, I mean, the RFP results showed that all those bidders certainly felt they could get the transmission into the market. I mean, if they were in the Northwestern, they wouldn't have made a bid if they didn't feel they could do that. And second when the petitioner's council talks about transmission capacity that's supposedly reserved, and this is what FERC found on that issue too, a lot of that is reserved for imports into the market. And so the problem that FERC had, and the logical problem with the petitioner's argument there, is they say that if transmission capacity is already served, it's not going to be available to Northwestern. Well, a lot of that transmission capacity is reserved precisely because it's reserved for imports into the market. And that would be available and would be accounted for as part of the market and would reduce BPL's market share. The market, has that affected at all by the long-term contract situation? Are they two different things? Well, I mean, I don't know. I mean, why don't you, maybe I'm not understanding what you're saying when it's already reserved for going into the market as an import. What do you mean by that? That's a transmission? Yeah, that just means it's firm transmission. It means you've got the right to transport. For example, wind power, they argue it's intermittent, but in fact, as FERC's council pointed out, it was in fact bid into the contract. You can get some firming capacity for that wind power. So that, you know, that's how it's created. But the bottom line is that FERC found there was a lot of capacity in this market, a lot of sellers in this market, both by looking at the RFP and by looking at the test. And they went beyond the test to look at the RFP and that. And the market Let me ask her question and see if you want to add anything else and then we'll say goodbye to you and hear from you. But the market that they're considering is, as you're describing it, not just what's generated in Montana, but anything that could be consumed in Montana. Is that right? It includes imports into Montana as well. It's included in the denominator. Right. That's included. As calculated. Right. Okay. Thank you. Jeff. Thank you, Your Honor. I'll try to be brief and focused. First, on the attachment A analysis, paragraphs 35 and 36 of the rehearing order discuss them.   another exhibit. The commission was discussing another exhibit. Second, the arguments of FERPA are very clear. They are not in the context that what they're talking about is the use of spot term markets as a measure for whether PPLM should get market rates. Our contention is that spot markets and long-term firm markets are different. The legal test for what they're different is what they're reasonably substitutable. That's Supreme Court antitrust law. Northwestern could not rely on spot market purchases no matter how much they are to keep the lights on and or the pricing in terms of supply. The supply, which is rate-based power for the Washington and Oregon utilities, which is sometimes sold short-term in Montana, but is not available long-term. They're not saying that it's available and it's the same market. They're using it as a proxy, as I understand it. Yes. So my question is, does their procedure allow for you to come in and say, well, you may have this presumption in general, but we can show you now, and I don't know whether you tried to, did you try to do this, that that assumption does not work in this market because the spot market, as you just said, if it's so, is otherwise committed energy, essentially, as to which there may be a little bit available on any particular day in the spot market, but which is never going to be available in the long-term market. Did you ever make that argument? Did you ever try to make a showing of that kind? Yes, Your Honor, and I'd like to  the next hearing, which is the pleadings and the affidavits and PPLM's analysis, and I would submit, if anything else is clear, that there needed to be a hearing. We specifically addressed the short-term versus long-term issue in Dr. Wilson's fourth affidavit, and the best place to look before the commission is our hearing request in which we discussed it, and also our pleadings to the commission, but I also submit to you. Did you appeal the lack of a hearing? Well, the the this is the appeal of the lack of the hearing. We requested the commission to order a hearing. I mean, there's two things. One, I understand substantive reasons for the agreement, but procedurally, is there a procedural appeal in terms of the use of discretion for not hearing? This was never before an examiner within the commission, or a presiding law judge. All of the pleadings were addressed to the commission. I understand, but the question is, did you appeal it to here, to the commission? No, and we couldn't have because it would have been deemed interlocutory. Now, now, now, now. Yes, yes, Your Honor. Let me ask you a question also. Ms. Bannon made a point that when all is said and done, FERC looked at the rates after the fact and concluded the rates are out of line with national rates. Their system Moscow work because the rates are not out of line after all. What's the answer to that? The rates in Montana since the restructuring have gone up about 100 percent. They said that's the national trend. Let me finish. First of all, just factually, PPLM's rates to Montana have gone up about 100 percent and 40 percent under the new contract. With respect to national market trends, most national supply is driven by natural gas prices. You were talking about a market dominated by coal which is much cheaper and it would be merely giving PPLM a windfall to allow them to have prices in other different unrelated markets. And I urge to you, all we are saying is if the market, the product we had to buy is long-term firm power, Your Honor, that that ought to have been studied and it hasn't been. Now, both councils argued that well, it doesn't matter because if we only studied spot markets because new plant can be built and because we had these RFP proposals. New baseload plant has not been built. It has not been built. It hasn't happened. The bids, the RFP responses were not in the record. And the reason they were not, there were confidentiality problems and we said they should have been examined, but what we do know, many of those bids were by PPL or were for non-baseload to build  If the question is the justice and reasonableness of power sales, speculative new plants do not study the market and the product and the market for power sales. Thank you very much, Your Honors.
judges: Silverman, McKeown, Berzon